# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LIVING HOPE CHURCH OF THE NAZARENE; )
GENE HEBERT, Lead Pastor of the Living Hope )
Church of the Nazarene; BEVERLY CHURCH )
OF THE NAZARENE; and KIM RICHARDSON, )
Senior Pastor of the Beverly Church of the )
Nazarene Living Hope Church of the Nazarene )
                Plaintiffs, )

     v. )

CITY OF PEABODY; MICHAEL BONFANTI, )
Mayor and Chairman, ex-officio, Peabody Public )
Schools School Committee, in his official and )
individual capacities; JOHN TUNNEY, )
Business Manager of the Peabody Public Schools, )
in his official and individual capacities; )
NADINE BINKLEY, Superintendent of the )
Peabody Public Schools in her official and )
individual capacities, )
                Defendants. )

Civil Case No. _____

**04 cv 12452 MLW**

# MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

COME NOW Plaintiffs, by counsel, and provide the following in support of their Motion for Preliminary Injunction in the above-captioned matter.

## I.  FACTS

Plaintiffs rely on the facts that are set forth in the Complaint, as well as the Affidavits and Exhibits contemporaneously filed herewith, and incorporate said facts by reference herein.

## II.    ARGUMENT

### A.    Preliminary Injunction Standard.

In the First Circuit, a plaintiff must prove four criteria when seeking a preliminary injunction: "(1) that [he or she] will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction." *Camel Hair & Cashmere Inst., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986). *See Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). As shown *infra*, Plaintiffs meet these criteria, and a preliminary injunction should issue.

### B.    Plaintiffs Have Suffered and Continue to Suffer Irreparable Injury to Their Constitutional Rights Under the First and Fourteenth Amendments.

Limiting expression protected by the First Amendment in a designated public forum is governed by the same standard as that of limiting such expression in a traditional public forum, *i.e.*, speakers may be excluded from either forum "only when the exclusion is necessary to serve a compelling state interest *and* the exclusion is narrowly drawn to achieve that interest." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985) (emphasis added). A blanket ban on religious speech, which has occurred here under the guise of the Establishment Clause, hardly serves a compelling state interest and hardly constitutes a narrowly drawn exclusion. Moreover, "[i]t has long been held that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1, 4 (1st Cir. 1987) (quoting, *Elrod v. Burns*, 427 U.S. 347, 373 (1976); 11A Charles A. Wright, *et*

*al.*, *Federal Practice and Procedure*, § 2948.1 at 161 (2d ed. 1995) ("when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary")).

Suppressing religious speech represents a classification "affecting fundamental rights," namely, the rights to free speech and free exercise of religion and, therefore, also violates the Equal Protection Clause of the Fourteenth Amendment. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("classifications affecting fundamental rights . . . are given the most exacting scrutiny"). As such, Defendants' application of their Policy inflicts irreparable harm on Plaintiffs.

Additionally, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State*, 308 U.S. 147, 163 (1939); *accord Grayned v. City of Rockford*, 408 U.S. 104, 118 n.40 (1972). Despite the fact that Defendants' application of their Policy creates a designated public forum, Defendants nevertheless deny access to religious users. Should Defendants assert that Plaintiffs *could* go elsewhere, that is simply not required by the Constitution, as the Supreme Court explained. Even if some other facility became available, that would not change the irreparable injury suffered by Plaintiffs here. Plaintiffs will continue to suffer as long as the blanket exclusion of religious users is in place.

**C.    The Plaintiffs' First Amendment Freedoms Have Been Infringed upon by Defendants, and Thus, Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

**1.    FREEDOM OF SPEECH**

The Supreme Court has set forth the following three types of fora. *See Perry Educ. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 45 (1983). Public fora are areas "which by long

3

tradition or by government fiat have been devoted to assembly and debate." *Id*. Designated (or limited) public fora are those which the state has voluntarily "opened for use by the public as a place for expressive activity." *Id*. Non-public fora consist of "[p]ublic property, that is not by tradition or designation a forum for public communication." *Id*. at 46.

A governmental organization that makes its facilities available for use by certain groups may not deny other specific (yet similar) groups equal use (or make specific restrictions) because of the religious content or viewpoint of their speech or activities. Public facilities become "designated public fora" when "authorities have 'by policy or practice' opened those facilities 'for indiscriminate use by the general public,' . . . or by some segment of the public . . ." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (citing *Perry Educ. Ass'n*, 460 U.S. at 47).

Government authorities may not discriminate against otherwise eligible speakers in designated public fora solely on the basis of the content of their speech unless the selective restriction "is necessary to serve a compelling state interest and . . . is narrowly drawn to achieve that end." *Widmar v. Vincent*, 454 U.S. 263, 270 (1981) (citation omitted); *accord Perry Educ. Ass'n*, 460 U.S. at 46. As a result, content-based censorship will be, in all but the most exceptional circumstances, inevitably unconstitutional.

> [A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. . . . The essence of this forbidden censorship is content control.... Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. . . . Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.

*Police Dep't v. Mosley*, 408 U.S. 92, 95-96 (1972) (citations omitted). When "it is the content of

4

the speech that determines whether it is within or without [the government's] blunt prohibition," the regulation is unconstitutional. *Carey v. Brown*, 447 U.S. 455, 462 (1980).

## a.    Religious speech is protected under the First Amendment.

"[P]rivate religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). Plaintiffs' speech is private religious speech which enjoys full constitutional protections. As the Supreme Court discussed in *Rosenberger v. Rector & Visitors of the Univ. of Va.*, (characterizing its previous holding in *Lamb's Chapel*), "discriminating against religious speech was discriminating on the basis of viewpoint." *Rosenberger*, 515 U.S. 819, 832 (1995). Such was the case despite no other simultaneous inclusion or exclusion of another religious viewpoint, *i.e.*, atheism, and such is the case here.

## b.    The Limited or Designated Public Forum.

If government opens a limited public forum (open for designated subject matter or only to certain speakers), "the State is not required to . . . allow persons to engage in every type of speech . . . .[However,] [t]he State's power to restrict speech . . . is not without limits. The restriction must not discriminate against speech on the basis of viewpoint . . .and the restriction must be 'reasonable in light of the purpose served by the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (quoting *Cornelius*, 473 U.S. at 806) (citation omitted). Notably, regardless of whether government has opened a limited public forum or the forum remains non-public, "the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384, 394 (1993) (quoting *Cornelius*, 473 U.S. at 806); *see also Good News/Good Sports*

*Club v. Sch. Dist. of the City of Ladue*, 28 F.3d 1501, 1505 (8th Cir. 1994).

Again, the Supreme Court recently "reaffirm[ed its] holdings in Lamb's Chapel and Rosenberger that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." *Good News Club*, 533 U.S. at 111-12.

The Supreme Court has firmly established that when the state creates a limited or designated public forum, it retains no authority to discriminate on the basis of viewpoint. Peabody Public Schools has opened its forum to varying forms of instruction and activities. It may not then prohibit instruction and activities simply because they come from a religious viewpoint. Discriminating on the basis of viewpoint is "an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. Moreover, "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* (citing *Perry Educ. Ass'n*, 460 U.S. at 46).

        c.    **Defendant Peabody Public Schools' "Community Use of School Facilities" Policy created a designated public forum open to a broad array of users.**

Defendant Peabody Public School's "Community Use of School Facilities" policy (hereinafter, "the Policy"), *see* Exhibit C (attached hereto), has created a designated (or limited) public forum for expressive purposes. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. at 267 (public facilities become designated public fora when "authorities have by policy or practice opened those facilities for indiscriminate use by the general public, . . . or by some segment of the public . . . .").

Peabody Public Schools are open to all manner of users. The Policy lists priorities for use

6

of their facilities, including but not limited to: "9. Local not for profit agencies serving the community at large, and not for profit agencies serving the general welfare." *The Policy*, Exhibit C at 1. Thus, depending on availability, *any* non-profit organization may access the facilities if it benefits the community or serves the general welfare.

Churches and religious organizations, such as Plaintiffs, not only serve the community at large, but they are *beneficial* to the community and for the general welfare, as the Supreme Court has recognized:

> [C]hurches, along with numerous other groups, produced these benefits, [ those being harmonious existence with the community at large and the fostering of moral or mental improvement], that we approved their exemption from property tax. The Court said quite plainly: "The State has an affirmative policy that considers these groups as beneficial and stabilizing influences in community life and finds this classification useful, desirable, and in the public interest."

*Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 13 (1989) (explaining that *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 672-73 (1970), did not uphold tax exemption as a religious accommodation, but a permissible recognition of religious organizations as beneficial to the community).[1]

In this case, the facilities were available for use at all relevant times to the filing of Plaintiffs' Complaint, *see Aff. Hebert* at ¶ 16. Additionally, Plaintiffs had previously been welcome in the Brown School, *see id.* at ¶¶ 8-13, and no further, legitimate reason has been stated by any Defendant to warrant non-renewal of the Plaintiffs' contract for use. *Id.* at ¶ 26-30.

---

[1] Plaintiff Beverly Church of the Nazarene has been recognized by the Massachusetts Department of Revenue as a 501(c)(3) corporation, and has issued a Certificate of Exemption. *See* Notice of Tax Exemption, No. 30048, attached hereto as Exhibit D.

> **d.    Defendants have engaged in unconstitutional view point discrimination in excluding plaintiffs from Peabody Public Schools.**

Peabody Public Schools' Policy, in practice and as applied to Plaintiffs, is inconsistent with the Supreme Court's decision in *Good News Club*.  Although exclusion of certain topics is permissible, those exclusions must meet constitutional standards.  Denying Plaintiffs access simply because they are a religious group is a *prima facie* case of viewpoint discrimination.  Regardless of the nature of the forum, any restriction on speech must be viewpoint neutral.  *Lamb's Chapel*, 508 U.S. at 394.  If the restriction is not viewpoint neutral, a court need not go further in deciding whether the intended use would be reasonable in light of the purpose served by the forum.  As the *Good News* Court found: "Because the restriction is viewpoint discriminatory, we need not decide whether it is unreasonable in light of the purposes served by the forum."  533 U.S. at 107.

The Court, in *Good News,* found that otherwise permissible subjects cannot be excluded from a forum simply because the subjects are discussed from a religious viewpoint.  *Id.* at 111-12.  Therefore, a blanket exclusion of religious speech, such as the Peabody Public Schools' application of their Policy to Plaintiffs, is *prima facie* viewpoint discrimination and cannot withstand constitutional scrutiny, absent some compelling state interest.  *Id.* at 112-14.

Assuming, *arguendo,* that Defendants' application of their Policy is not viewpoint discriminatory, Defendants' claim might theoretically have merit *if,* by continuing Plaintiffs' contract, the nature of the forum would be transformed beyond recognition from the community building's intended use.  *Perry Educ. Ass'n*, 460 U.S. at 50; *see also Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 692 (1992).  Clearly, however, Plaintiffs' intended services and meetings are "reasonable in light of the purpose served by the forum." *Good News Club*, 533 U.S.

at 107 (quoting *Cornelius*, 473 U.S. at 806). The forum, Peabody Public Schools, is routinely used for various forms of instruction from a wide spectrum of viewpoints. The written policy absolutely allows for such a wide array of uses in its list of priorities:

1. Programs of instruction for Peabody Public School students
2. School-affiliated athletic, cultural or social activities for students
3. PSD Programs of Instruction for adults in the city
4. Programs and activities of school-associated organizations (*e.g.*: PTO's, Library Mothers, Home and School Associations, etc.)
5. Activities of the Peabody Recreation Department
6. Official activities by Departments of City Government
7. Cultural and Social activities by Departments of City Government
6. [sic] Local not-for-profit agencies serving the children or youth of the community
9. Local not for profit agencies serving the community at large, and not for profit agencies serving the general welfare
10. Commercial instructional agencies serving students in the community

*See The Policy*, Exhibit C.

The only material difference between the type of instruction or activities that Plaintiffs seek to give and the type of instruction or activities that are routinely permitted under the Peabody Public Schools' community use Policy is that Plaintiffs' instruction and activities are from a religious perspective. Additionally, under Use Priority No. 9, there is no requirement that any "instruction" be given at all. The Policy merely requires that groups such as Plaintiffs serve either the community or the general welfare. Churches have long been considered a benefit to their surrounding communities, and it is apparent that the past administration thought so of Plaintiffs. *See Aff. Hebert* at ¶¶ 8-12.

In *Good News Club*, the Court concluded that "[w]hen Milford denied the Good News Club access to the school's limited public forum on the ground that the Club was religious in nature, it discriminated against the Club because of its religious viewpoint in violation of the Free Speech Clause of the First Amendment." 533 U.S. at 120. Likewise, when Defendants denied Plaintiffs

access to otherwise available public facilities solely because of their religious nature, Defendants discriminated against Plaintiffs' religious viewpoint in violation of the Free Speech Clause of the First Amendment.

**e.    Defendants lack any compelling interest to defend their exclusion of plaintiffs from their designated public forum.**

Plaintiffs cannot constitutionally be denied use of the forum simply because their instruction and activities are from a religious viewpoint, and where Defendants have not stated any compelling interest to support their exclusion. The Supreme Court in *Good News Club* reaffirmed the principle that this type of viewpoint discrimination cannot withstand constitutional scrutiny, absent some compelling state interest. 533 U.S. at 112-14. There is no such compelling state interest in this matter. Although "[t]here is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech," *Pinette*, 515 U.S. at 761-62 (citing *Lamb's Chapel*, 508 U.S. at 394-95), the Supreme Court rejected the compelling-state-interest Establishment Clause defense where state property was open to a wide variety of uses, the state was not directly sponsoring the religious group's activity, and any benefit to religion would have been no more than incidental. *Pinette*, 515 U.S. at 762. Such is the case here.

Further, potential problems or offended observers cannot amount to compelling interests: "In the light of the Supreme Court's consistent approval of the use of government property by religious groups...any reluctance toward allowing 'purported religions' to use community centers is inherently discriminatory and an untenable reason for the restrictions." *Daily v. N.Y. City Hous. Auth.*, 221 F. Supp. 2d 390, 405 (E.D.N.Y. 2002). Although opening up the community center, in the *Daily* case, to religious activities could have led to the inclusion of "a plethora of purported religions,...the potential for 'havoc' or 'problems' is not sufficient to justify a regulation that on its

10

face reveals a hostility to a religious viewpoint." *Id.* at 405-06.   Likewise, "government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).   That private religious views may be controversial or even offensive to others does not justify governmental prohibition. Some observer's offense, taken because of Plaintiffs' use of the Brown School, does not amount to a legally compelling interest.

The Defendants' Policy as applied to Living Hope Church of the Nazarene includes a blanket exclusion of religious speech.   When Plaintiffs were denied the opportunity to renew their contractual use of the Brown School, they were told that their use would be "unconstitutional," *see Aff. Hebert* at ¶ 20, because of the "separation of church and state." *Id.* at ¶ 24.   Moreover, Defendant Tunney accused the Plaintiffs of seeking private gain, comparing them to a Kinko's commercial enterprise. *Id.* at ¶ 27.   That accusation came in response to Plaintiff Hebert's inquiry as to what other "issues" Mr. Tunney had with allowing the Plaintiffs to use the Brown School's facilities. *Id.* at ¶ 26.   Aside from the lack of any Establishment Clause defense, obviously, Defendants do not have any legitimate reason for keeping the Plaintiffs out of the Brown School. That Defendant Tunney appears to have gone on a fishing expedition in search of a reason to keep Plaintiffs out of the Brown School is quite telling.

Restrictions on access based on the subject matter of the speech are permissible "only if the regulation is reasonable *and* not an effort to suppress expression due to the *view* expressed." *Ward v. Hickey*, 996 F.2d 448, 454 (1st Cir. 1993) (quoting *Perry Educ. Ass'n*, 460 U.S. at 46) (emphasis added).   The restriction imposed by Defendants on *all* religious speech is neither reasonable in light of the purpose served by the forum nor viewpoint neutral. *See, e.g., Lamb's Chapel*, 508 U.S. at 394

11

(excluding all religious speech constitutes unconstitutional viewpoint discrimination, the most egregious form of content-based censorship); *Rosenberger*, 515 U.S. at 832 ("discriminating against religious speech was discriminating on the basis of viewpoint"). Rather, it confirms an irrational hostility to religious speakers and religious messages. Defendants' blanket exclusion has no compelling interest to support it and is thus *prima facie* viewpoint discrimination and must be enjoined.

**f.    Contrary to Defendants' assertion, allowing religious groups the same access as other non-profit organizations will not violate the Establishment Clause.**

Defendants have committed a common error. They mistakenly believe that allowing Living Hope Church to use the facilities would violate the Establishment Clause. *See Aff. Hebert* at ¶ 24. Yet, the Court in *Good News Club* found that allowing the religious club to meet on school premises on the same basis as other groups would cause "no realistic danger that the community would think that the District was endorsing religion or any particular creed." 533 U.S. at 113 (quoting *Lamb's Chapel*, 508 U.S. at 395).

> "[B]ecause our concern is with the . . . community writ large, the endorsement inquiry is *not about the perceptions of particular individuals* or saving isolated nonadherents from . . . discomfort . . . .
>
> . . . It is for this reason that the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and the forum in which religious [speech takes place]."

*Good News Club*, 533 U.S. at 119 (quoting *Pinette*, 515 U.S. at 779-80 (O'Connor, J., concurring in part and concurring in judgment)) (citations omitted).

There is a "crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free

Exercise Clauses protect." *Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 250 (1990) (emphasis added). Plaintiffs' private speech cannot cause an Establishment Clause violation, whereas Defendants' denial of access to Plaintiffs violates both the Free Exercise (see discussion *infra*) and Free Speech clauses. Moreover, Defendants' denial constitutes hostility to religious speech in violation of the Establishment Clause. *Mergens*, 496 U.S. at 248.

## 2. ESTABLISHMENT CLAUSE: Singling out religious speech for suppression violates the Establishment Clause of the First Amendment.

The Defendants' Policy as applied to Plaintiffs violates the Establishment Clause of the First Amendment. The Establishment Clause is violated when the State acts to either advance or inhibit religion. *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997) (citing *Witters v. Washington Dep't of Svcs. for Blind*, 474 U.S. 481, 485-86 (1986)). "[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Lamb's Chapel*, 508 U.S. at 394 (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). Further, "'[t]he Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities.'" *Mergens*, 496 U.S. at 248 (quoting *McDaniel v. Paty*, 435 U.S. 618, 641 (1978) (Brennan, J., concurring in judgment)). Singling out *religious* speech for suppression "would demonstrate not neutrality but hostility toward religion." *Mergens*, 496 U.S. at 248. The bottom line is that "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't v. Mosley*, 408 U.S. 92, 95-96 (1972). Defendants have violated all of these principles.

Defendants denied Plaintiffs any renewal of their previous contracts to use the Brown School

facilities for a number of suspect reasons. Rather than neutrally treat all requests for use the same, Defendants found a "glitch" to keep Plaintiffs from utilizing the Brown School. When faced with the possibility that they could be wrong on Establishment Clause jurisprudence, Defendant Tunney went on a fishing expedition to find a way to keep Plaintiffs out. Neither Mr. Tunney nor any other Defendant offered even one plausible reason for Plaintiffs' exclusion – only that they are religious. Singling out religious uses indicates a hostility to religion in favor of non-religion. The Policy as applied to Plaintiffs singles out religious speech not only for special detriment, but for outright suppression. Such a policy reflects an irrational hostility to religious speech on the part of Peabody Public Schools officials, which renders their exclusion of Plaintiffs unconstitutional.

### 3.    FREE EXERCISE OF RELIGION

"At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). "The crucial word in the constitutional text is 'prohibit': 'For the Free Exercise Clause is written in terms of what the government cannot do to the individual . . ..'" *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) (quoting *Sherbert v. Verner*, 374 U.S. 398, 412 (1963)). Even if a regulation is facially neutral, "'in its application, [it may] nonetheless offend the constitutional requirement of neutrality if it unduly burdens the free exercise of religion.'" *Thomas Review Bd. Of the Ind. Employment Security Div.*, 450 U.S. 205, 220 (1972); *Walz v. Tax Comm'n*, 397 U.S. 664 (1970).

### a.    Substantial Burden

Without question, the Defendants have placed a substantial burden on the Plaintiffs where

14

they have prohibited them from exercising their faith, from speaking their religious views, and from engaging in their religious activities on the Defendants' premises, that has been opened by written policy to *any* not-for-profit group that serves the community at large or the general welfare. As discussed previously, Plaintiff Beverly Church of the Nazarene is a tax exempt organization as recognized by the Massachusetts Department of Revenue, and qualifies as an organization that benefits the community at large and the general welfare. Plaintiff Living Hope Church of the Nazarene is an extension of Beverly Church of the Nazarene, and seeks to benefit the community at large and the general welfare in Peabody through its religious exercise. Thus, Defendants' denial of Plaintiffs' renewal application thwarts Plaintiffs' purposes.

Again, Plaintiffs are not required to seek some other location to exercise their faith (although they have sought many other locations, and they were not able to find suitable facilities in Peabody other than Defendants' premises). This foundational principle is worth repeating: "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State*, 308 U.S. at 163. For the foregoing reasons, Defendants have placed a substantial burden upon Plaintiffs' right to the Free Exercise of Religion. Their religious practice has been completely forbidden in Defendants' facilities, and that without any compelling interest to support Defendants' decision.

### b.    Neutrality and General Applicability Requirements

When the First Amendment right to the Free Exercise of Religion is at stake, rational basis review is only appropriate if the law in dispute is a neutral and generally applicable law. *See Employment Div., Dept. Of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879 (1990). Moreover, "if the object of the law is to infringe upon or restrict practices because of their religious

15

motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 533.

Obviously, the Defendants' Policy as applied to Plaintiffs is not neutral. In practice, the Policy excludes all religious organizations directly, and therefore fails the test for neutrality. Further, neutrality and general applicability are "interrelated, and the failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531. With this principle in mind, Defendants' Policy as applied to Plaintiffs cannot be generally applicable – it is a blanket prohibition against religious use only.

### c.    **Standard of Review**

Because Defendants have imposed a substantial burden on Plaintiffs, and because their Policy as applied to Plaintiffs fails the neutrality and general applicability tests, Defendants are required to justify their actions with a compelling state interest, and the regulation must be narrowly tailored to achieve that interest. As already discussed at length above, Defendants have failed to set forth any compelling interest, and Defendant Tunney's statements accusing Plaintiffs of running a commercial operation akin to a Kinko's are, at best, suspect. In fact, such a ludicrous accusation is telling of the actual hostility Defendants possess against religious entities.

### 4.    **EQUAL PROTECTION**

The Equal Protection Clause requires the State to refrain from discriminatory action against similarly situated persons. As the Supreme Court has expressed on many occasions, "the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Willowbrook v.*

16

*Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923) (quoting *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 352 (1918)); *see also Phyler v. Doe*, 457 U.S. 202, 216 (1982).

Further, if the State's action touches upon a fundamental right, such as Freedom of Speech or the Free Exercise of Religion, or targets a suspect classification, such as race, the action is subject to strict scrutiny. *See Heller v. Doe*, 509 U.S. 312, 320-21 (1993); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("classifications affecting fundamental rights . . . are given the most exacting scrutiny"); *Johnson v. Robinson*, 415 U.S. 361, 375 n.14 (1974) ("Unquestionably, the free exercise of religion is a fundamental constitutional right."). Strict scrutiny requires government to demonstrate that its action is narrowly tailored to achieve a compelling state interest. *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). As discussed herein, the Defendants have infringed upon several of Plaintiffs' fundamental rights: Freedom of Speech, the Free Exercise of Religion, and the right to be free from any governmental Establishment of Religion. As such, strict scrutiny applies – and as Plaintiffs previously argued herein – Defendants have no compelling state interest to support their discriminatory decision to ban all religious users from using their public facilities. Finally, that blanket ban certainly cannot be considered narrowly tailored.

### D. Granting the Injunction Would Do No Harm to Defendants and Is in the Public Interest.

Granting Plaintiffs permission to use otherwise available Peabody Public Schools facilities for religious activities causes no harm to Defendants whatsoever. In fact, Plaintiffs' prior use of the facilities exhibits a lack of harm. Plaintiffs are merely asking that Defendants apply their policy fairly and impartially. As previously discussed, Defendants' only assertion of any problem is their misunderstanding of Establishment Clause jurisprudence. Any further rationale is and would be

contrived. Plaintiffs are not asking for any special favors. Yet, as previously argued, Defendants' denial of permission to use otherwise available facilities for Plaintiffs' protected expression constitutes past, present and continuing violations of Plaintiffs' constitutional rights. The balance of harms weighs heavily in Plaintiffs' favor.

The public interest at stake also favors Plaintiffs. It is in the public interest that public officials act in a manner that protects First Amendment rights and that they fairly and impartially draft and implement public policies. The public interest is, in fact, harmed when public officials single out religious speech for suppression, as our Establishment Clause and Free Exercise jurisprudence teaches. *See, e.g., Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 543 (1993) ("[G]overnment, in pursuit of legitimate interest, cannot, in a selective manner, impose burdens only on conduct motivated by religious belief . . . .").

## III.    PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, Plaintiffs meet the requirements for obtaining a Preliminary Injunction in this matter, and Plaintiffs respectfully request that this Court issue a Preliminary Injunction enjoining Defendants, their agents, employees, attorneys, and all those acting in concert with them, from denying Plaintiffs use of otherwise available Peabody Public Schools facilities, on the same terms and under the same conditions as all other similar users pending resolution of this matter in open court.

Respectfully submitted this _19th_ day of November 2004.

AMERICAN CENTER FOR LAW AND JUSTICE, NORTHEAST

_Thomas M. Harvey_

Thomas M. Harvey, Esq.
MA Bar No. 225050
One Constitution Plaza
Boston, MA 02129
(617) 886-0364
Fax: (617) 598-3900

American Center for Law & Justice
Vincent P. McCarthy, Senior Regional Counsel[†]
    CT Bar No. 100195
Kristina J. Wenberg, Esq.[†]
    CT Bar No. 421555
P.O. Box 1629
8 South Main Street
New Milford, Connecticut 06776
(860) 355-1902
Fax: (860 355-8008

† Pro Hac Vice Motion filed simultaneously

19

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIVING HOPE CHURCH OF THE NAZARENE; )<br>GENE HEBERT, Lead Pastor of the Living Hope )<br>Church of the Nazarene; BEVERLY CHURCH )<br>OF THE NAZARENE; and KIM RICHARDSON, )<br>Senior Pastor of the Beverly Church of the )<br>Nazarene Living Hope Church of the Nazarene )<br>Plaintiffs, )<br> )<br> )<br>v.                                      )<br> )<br>CITY OF PEABODY; MICHAEL BONFANTI, )<br>Mayor and Chairman, ex-officio, Peabody Public )<br>Schools School Committee, in his official and )<br>individual capacities; JOHN TUNNEY, )<br>Business Manager of the Peabody Public Schools, )<br>in his official and individual capacities; )<br>NADINE BINKLEY, Superintendent of the )<br>Peabody Public Schools in her official and )<br>individual capacities, )<br>Defendants. ) | Civil Case No. _____<br><br><br>**04 CV 12452 MLW** |

## AFFIDAVIT OF GENE HEBERT

I, Gene Hebert, make the following declaration under the penalty of perjury:

1.   I, Gene Hebert, am the Lead Pastor of Living Hope Church of the Nazarene, and Associate Pastor of Beverly Church of the Nazarene.

2.   Living Hope Church of the Nazarene is a ministry of Beverly Church of the Nazarene, and the principal address for both ministries is 556 Cabot Street, Beverly, Massachusetts 01915.

3.   In June through August 2003, several people from the Beverly Church of the Nazarene

EXHIBIT A

began to pray about, research and plan for beginning a new ministry, and in September 2003, we focused on planting this new ministry in the City of Peabody, Massachusetts. We completed the demographics, visited other churches, and prayerfully considered the time line to be established. The new ministry name is Living Hope Church of the Nazarene ("Living Hope").

4.   Early in 2004, many things took place in order to help us be prepared for a March 14, 2004 opening service. However, we did not obtain a site for the new Church. We explored over twenty-five locations, but none met the Living Hope's needs.

5.   During this period, we explored the Peabody Public Schools as a potential location. We inquired with the School Department and were told that, by policy, each individual school principal had the authority to decide who may access Peabody Public School facilities.

6.   On January 6, 2004, Pastor Kim Richardson filled out an application with the Peabody Public Schools' business office to determine which, if any, schools would be available.

7.   After a few weeks passed, and after several telephone calls, it became apparent that none of the schools were available.

8.   Approximately mid-February 2004, I received a call from the principal of the Brown School, Ernie Osborne. Principal Osborne asked if we would like to use the facilities of the Brown School, and we accepted the invitation. We met with Principal Osborne and the janitors, who would be setting up for our meetings, shortly thereafter. All necessary paperwork was completed and signed on February 23, 2004, and the contract ran from March 7 through June 30, 2004.

2

9. The parties signing the February 23, 2004 contract were myself, Principal Ernie Osborne, and then-business manager, David Keniston.

10. Living Hope continued to meet at the Brown School every Sunday, except Easter, for the next three months. We also rented the facility on a Wednesday evening, May 12, 2004, for a youth activity in conjunction with the Beverly Church of the Nazarene.

11. On April 4, 2004, we concluded that we would not be able to move into our permanent space by the end of our contract, and therefore, we requested that we sign another contract for an additional four months. However, when the contract was returned on June 3, 2004, the dates had been changed to reflect June 30, 2004 for the end date. We understood this date change was entered because of construction taking place during the Summer months.

12. The parties signing the June 3, 2004 contract were myself, Principal Ernie Osborne, and then-business manager, David Keniston.

13. We informed Principal Osborne and Mr. Keniston that we would likely attempt to rent the facilities again in September 2004. However, they informed us that they would no longer be working in their respective position in September, and that we would be dealing with new employees.

14. We continued to meet during the Summer at the Beverly Church of the Nazarene.

15. On or about August 8, 2004, I contacted the business office and requested that they send us a building use form. At that time, I also contacted the new principal at the Brown School, Patty Messina, to arrange a meeting with her, per Peabody Public Schools policy, for determining the Brown School's availability.

3

16. We met with Principal Messina shortly thereafter, and she informed us that she had spoken to the janitors and received a great report as to our reliability as renters. She expressed that she would be happy to allow our Church to rent the facilities.

17. On August 23, 2004, I received, filled out, and mailed the Brown School's building use form. I requested use from September 12, 2004 through June 12, 2005.

18. On September 7, 2004, I called Principal Messina to confirm that the janitor would be ready for us on Sunday and to go over any last minute details. At this time, I also asked her if she had signed the building use form. She informed me that she did not know that she had to sign the form, but would call business office and sign it right away.

19. Principal Messina called me back a few moments later to inform me of a "glitch." She then directed me to call the new business manager, John Tunney.

20. I called Mr. Tunney immediately, and he informed me that it was unconstitutional for the Church to use the school building, and that the city attorney, Larry O'Keefe had confirmed this.

21. I informed Mr. Tunney that I was certain that this was not the case, and that I would get back to him with some information.

22. I then obtained some web site materials from the American Center for Law and Justice, www.aclj.org, ("ACLJ") and sent that information, via fax, to Mr. Tunney for his review. Those materials explained that it was not unconstitutional for a church to use a school building on an equal basis with other similar groups.

23. On September 7, 2004, Mr. Tunney confirmed to me that he received the ACLJ's materials I had faxed over to him, and forwarded those same materials to Attorney

4

O'Keefe.

24.    On September 10, 2004, Mr. Tunney and I conversed again, and he informed me that he still believed that churches could not access Peabody Public Schools facilities because of "separation of church and state," and that Attorney O'Keefe had confirmed this position.

25.    I then asked Mr. Tunney if having an attorney speak with Attorney O'Keefe would clear up the issue, and Mr. Tunney responded that he had other issues with renting the facilities to our Church.

26.    I pressed Mr. Tunney as to the other "issues" he had with our renting the facilities, and Mr. Tunney responded with a further question as to what the Church's criteria would be for leaving the School.

27.    I responded that the Church's criteria for leaving the school would require establishing a stable congregation and achieving financial stability.  Mr. Tunney responded by accusing the Church of being a "business just like Kinko's" and informed me that he could not rent to a business.

28.    I then informed Mr. Tunney that we were a non-profit organization; that we apparently had nothing further to discuss; and that I would be pursuing the issue further.

29.    Following my conversation with Mr. Tunney, I telephoned Nadine Binkley, the Superintendent of Schools for Peabody Public Schools, and asked her if she was aware of the situation.  Superintendent Binkley advised me that she had also been advised by Attorney O'Keefe that renting School facilities to a church would be unconstitutional.

30.    I raised Mr. Tunney's accusation that Living Hope was a business similar to Kinko's with Superintendent Binkley, she asked that I contact her directly in the future regarding these

5

matters.

31.    I then contacted the ACLJ, my current attorneys, on September 10, 2004, requesting their

representation.

32.    On September 24, 2004, the ACLJ sent a demand letter to Attorney O'Keefe, requesting

a response on their position in these matters by October 1, 2004, to which we did not

receive a response.

33.    Attorney O'Keefe later informed my attorneys that he had referred the matter to another

attorney, Daniel Kulak.  However, Attorney Kulak also failed to respond to date.

34.    We prayerfully considered, and decided to file suit in this Court regarding these matters.

Further, AFFIANT sayeth nought.


EXECUTED this _11_ of ~~October~~ November 2004, at _Beverly MA_

Gene Hebert
_____
Gene Hebert


STATE OF _Massachusetts_
COUNTY OF _Essex_
The foregoing instrument was acknowledged before me this _11th_ day of November 2004, by
**Gene Hebert**.

Kathleen R. Bourgault
_____
Notary Public


KATHLEEN R. BOURGAULT
Notary Public
My Commission Expires
September 1, 2006

6

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LIVING HOPE CHURCH OF THE NAZARENE; )
GENE HEBERT, Lead Pastor of the Living Hope )
Church of the Nazarene; BEVERLY CHURCH )
OF THE NAZARENE; and KIM RICHARDSON, )
Senior Pastor of the Beverly Church of the )
Nazarene Living Hope Church of the Nazarene )
　　　　　　　　　　　Plaintiffs, )
　　　　　　　　　　　　　　　　　　　　　　)
　　　　v. )
　　　　　　　　　　　　　　　　　　　　　　)
CITY OF PEABODY; MICHAEL BONFANTI, )
Mayor and Chairman, ex-officio, Peabody Public )
Schools School Committee, in his official and )
individual capacities; JOHN TUNNEY, )
Business Manager of the Peabody Public Schools, )
in his official and individual capacities; )
NADINE BINKLEY, Superintendent of the )
Peabody Public Schools in her official and )
individual capacities, )
　　　　　　　　　　　Defendants. )

Civil Case No. _____

**04 cv 12452 MLW**

### AFFIDAVIT OF KIM RICHARDSON

I, Kim Richardson, make the following declaration under the penalty of perjury:

1.　　I, Kim Richardson, am the Senior Pastor of the Beverly Church of the Nazarene and the

Senior Pastor of Living Hope Church of the Nazarene.

2.　　Living Hope Church of the Nazarene is a ministry of Beverly Church of the Nazarene,

and the principal address for both ministries is currently 556 Cabot Street, Beverly Massachusetts

01915.

3.　　In June through August 2003, several people from the Beverly Church of the Nazarene

1

began to pray about, research and plan for beginning a new ministry, and in September 2003, we focused on planting this new ministry in the City of Peabody, Massachusetts. We completed the demographics, visited other churches, and prayerfully considered the time line to be established. The new ministry name is Living Hope Church of the Nazarene ("Living Hope").

4.  In approximately early 2004, we began to prepare for an opening service on March 14, 2004. However, we did not obtain a site for the new Church. We explored over twenty-five locations, but none of these locations were suitable.

5.  I then contacted the Peabody Public Schools during this same time-frame, considering one of the schools as a potential location.   I spoke with Holly, the Business Manager's administrative assistant at the time, who told me that we must be invited by an individual school's principal.

6.  On or about January 6, 2004, I filled out an application with the Peabody Public Schools' business office to determine which, if any, schools would be available.

7.  After a few weeks passed, and after several telephone calls, it became apparent that none of the schools were available.

8.  Approximately mid-February 2004, we received a call from the principal of the Brown School. I visited the Brown School, met with Principal Osborne, who showed me the area of potential rental, and then encouraged Pastor Gene Hebert to visit the next day. After Pastor Hebert visited the Brown School and met Principal Osborne, we accepted the invitation.

9.  Lead Pastor Gene Hebert continued working with the school officials from this point

forward.

Further, AFFIANT sayeth nought.

EXECUTED this _11th_ of November 2004, at _Beverly, MA_

_Kim Richardson_ (signature)
Kim Richardson

STATE OF _Massachusetts_
COUNTY OF _Essex_

The foregoing instrument was acknowledged before me this _11th_ day of November 2004, by **Kim Richardson**.

_Kathleen R. Bourgault_ (signature)
Notary Public

KATHLEEN R. BOURGAULT
Notary Public
My Commission Expires
September 1, 2006

3

ALUMNI

CALENDARS

COMMUNITY
EDUCATION

CURRICULUM
& INSTRUCTION

DIRECTIONS

DIRECTORY

FOOD SERVICES

GUIDANCE

HEALTH SERVICES

KINDERGARTEN

NEWS

PARENTS

PERSONNEL

POLICY MANUAL

SCHOOL COMMITTEE

STAFF E-MAIL

TRANSPORTATION

HOME

SITE INDEX

# Peabody Public Schools

**1854-2004 : 150 YEARS OF GEORGE PEABODY MEDAL SCHOLARS**

*"EDUCATION - A DEBT DUE FROM PRESENT TO FUTURE GENERATIONS" - George Peabody, 1852*

NADINE BINKLEY, Ph.D., SUPERINTENDENT of SCHOOLS: MESSAGE

SCHOOLS: BROWN | BURKE | CARROLL | CENTER | McCARTHY | SOUTH | WELCH | WEST | HIGGINS | PVMHS

File: KF

## COMMUNITY USE OF SCHOOL FACILITIES

The Peabody School Committee wishes the facilities under its control to be used by responsible agencies within the community. These facilities should be used and maintained in a manner consistent with the requirements of the Peabody Public Schools program of instruction. School facilities shall not be available for commercial gain or personal benefit.

*Priorities for the use of school facilities* are established as follows:

1.  Programs of instruction for Peabody Public School students.
2.  School-affiliated athletic, cultural or social activities for students
3   PSD Programs of Instruction for adults in the city
4.  Programs and activities of school-associated organizations (e.g.: PTO's, Library Mothers, Home and School Associations, etc.)
5.  Activities of the Peabody Recreation Department
6.  Official activities by Departments of City Government
7.  Cultural and Social activities by Departments of City Government
6.  Local not-for-profit agencies serving the children or youth of the community
9.  Local not for profit agencies serving the community at large, and not for profit agencies serving the general welfare
10.  Commercial instructional agencies serving students in the community

Although it is the intent of the School Committee to promote community use of school facilities, it is also its responsibility to see that funds appropriated for education are used for education. Therefore, it is *the policy*

EXHIBIT C

of the Peabody School Committee that:

- No event takes place without the *permission of the Principal* of that school;
- No event takes place without the *presence of either an administrator or a custodian*;
- The sponsoring organization schedules events/activities so that they do not interfere with the *regular education program*;
- The sponsoring organization will be responsible for *returning the facility to its previous condition* and/or be held liable to compensate the school department for repairs that may result due to an) damage to the facilities.

The *User Fee* structure will be reviewed annually during the budget process, so that a recommendation can be made for the following school year.

School facilities shall be available free of charge for *school-sponsored activities or meetings* (e.g. parent-teacher conferences, open house; graduation) providing that:

- The event is scheduled and approved by the Principal of that school.
- No meeting is being held without the presence of either an administrator or a custodian.
- Student events are arranged under the direction of school staff members.
- Note that, if costs are incurred for overtime or additional time, these costs will be passed onto the organization sponsoring the event.

School facilities, use of custodians and other school personnel shall be available free of charge to the City of Peabody for use during City *Elections.*

School facility building use rental fees shall be waived for *school-associated organizations* (e.g. the Peabody Recreation Department, the Peabody City Government Department and/or non-profit organizations serving the children and youth of the community) providing that an admission fee is not required.

- If the meeting/activity occurs in an elementary school and requires clean up after 7:00 PM, custodial fees would be assessed.
- If the meeting/activity occurs in either the Higgins Middle School or in the PVMHS and requires clean up after 11:00 PM, custodial fees would be assessed.
- If the meeting/activity occurs on a weekend, custodial fees would be assessed.
- If the meeting group is small and has the permission of the Principal, an administrator can open and close the school building without custodial coverage.
- If the activity/meeting will require the use of other school personnel, these expenses will be applied to the organization's costs.

Note: Each elementary school PTO can apply for building use/custodial fee waivers for up to two Fundraiser Events each school year.

All non-school organizations must reimburse the Peabody School Department full costs for use of the facility, the custodial services and /or services of additional personnel on duty in the building (cafeteria workers, lighting or special equipment operators, etc.)

Any group (school or non-school) that believes there is good cause to waive building use or other fees applied to its event, can request a wavier of the School Committee. The waiver must be approved by the School Committee prior to the date of the event.

Adopted:        October 28, 2003

Peabody Public Schools Policy Manual

11/17/2004 04:56 PM    Peabody Public Schools, 70 Endicott St., Peabody, Mass. 01960  Phone: 978.531.1600
*Website Author* | *Contact Us*

The district does not take responsibility for the contents of outside sites listed here and does not by their listing endorse the points of view represented at any particular site.
Copyright Notice: No materials on any of the Peabody Schools' web pages may be copied without express written permission unless permission is clearly stated on the page.



**Massachusetts Department Of Revenue**

200 Arlington Street PO Box 7010 Chelsea, MA 02150-7010

ALAN LeBOVIDGE, COMMISSIONER
LAURIE MCGRATH, ACTING DEPUTY COMMISSIONER                870

Notice                   30048
Exemption                237 399 651
Number
Date                     12/09/03
Bureau                   TSD MGT SERV
Phone                    (617) 887-6367

BEVERLY CHURCH OF THE NAZARENE
556 CABOT STREET
BEVERLY, MA  01915-2510

Dear Taxpayer,

A review of our records indicates that the Massachusetts sales/use tax exemption for BEVERLY
CHURCH OF THE NAZARENE , a tax-exempt 501(c) (3) organization, will expire on 01/04/04.

The Department of Revenue is issuing this notice in lieu of a new Form St-2, "Certificate of Exemption".
The notice verifies that the Massachusetts Department of Revenue has renewed the sales/use tax
exemption for BEVERLY CHURCH OF THE NAZARENE  subject to the conditions stated in
Massachusetts General Laws, Chapter 64H, sections 6(d) or (e), as applicable.

The organization remains responsible for maintaining its exempt status and for reporting any loss or
change of its status to the Department of Revenue. Absent  the Department of Revenue's receipt of
information from the taxpayer  by the expiration date of the current certificate that the entity no longer
holds exempt status under the above provisions, the taxpayer's certificate is renewed. **This renewal v**
**expire on 01/04/09.**

The taxpayer's existing Form ST-2, in combination with this renewal notice may be presented as evi
of the entity's continuing exempt status. Provided that this requirement is met, all purchases of tang
personal property by the taxpayer are exempt from sales/use taxation under Chapter 64H or I
respectively, to the extent that such property is used in the conduct of the purchaser's business.

Any abuse or misuse of this notice by any tax-exempt organization or any unauthorized use of this notic
individual constitutes a serious violation and will lead to revocation. **Willful misuse of this notic**
**subject to criminal sanctions of up to one year in prison and $10,000 in fines ($50,000 fo**
**corporations).**

This  notice may be reproduced.

Sincerely,

Alan LeBovidge o
Commissioner o

EXHIBIT

# Massachusetts Department Of Revenue





200 Arlington Street PO Box 7010 Chelsea, MA 02150-7010

ALAN LeBOVIDGE, COMMISSIONER
LAURIE MCGRATH, ACTING DEPUTY COMMISSIONER

BEVERLY CHURCH OF THE NAZARENE          870
556 CABOT STREET
BEVERLY, MA  01915-2510

| | |
|---|---|
| Notice | 30048 |
| Exemption Number | 237 399 651 |
| Date | 12/09/03 |
| Bureau | TSD MGT SERV |
| Phone | (617) 887-6367 |

Dear Taxpayer,

A review of our records indicates that the Massachusetts sales/use tax exemption for **BEVERLY CHURCH OF THE NAZARENE** , a tax-exempt 501(c) (3) organization, will expire on **01/04/04.**

The Department of Revenue is issuing this notice in lieu of a new Form St-2, "Certificate of Exemption". The notice verifies that the Massachusetts Department of Revenue has renewed the sales/use tax exemption for **BEVERLY CHURCH OF THE NAZARENE**  subject to the conditions stated in Massachusetts General Laws, Chapter 64H, sections 6(d) or (e), as applicable.

*The organization remains responsible for maintaining its exempt status and for reporting any loss or change of its status to the Department of Revenue. Absent  the Department of Revenue's receipt of information from the taxpayer  by the expiration date of the current certificate that the entity no longer holds exempt status under the above provisions, the taxpayer's certificate is renewed.  **This renewal will expire on  01/04/09.***

The taxpayer's existing Form ST-2, in combination with this renewal notice may be presented as evidence of the entity's continuing exempt status.  Provided that this requirement is met, all purchases of tangible personal property by the taxpayer are exempt from sales/use taxation under Chapter 64H or I respectively, to the extent that such property is used in the conduct of the purchaser's business.

Any abuse or misuse of this notice by any tax-exempt organization or any unauthorized use by any individual constitutes a serious violation and will lead to revocation. **Willful misuse of this notice is subject to criminal sanctions of up to one year in prison and $10,000 in fines ($50,000 for corporations).**

This  notice may be reproduced.

Sincerely,

Alan LeBovidge
Commissioner of Revenue

EXHIBIT D